.IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

        v.                                    Case No. 19-20049-1-JAR

ORLANDO ALEXIS GAXIOLA-GUEVARA,

        Defendant.

## MEMORANDUM AND ORDER

Defendant Orlando Alexis Gaxiola-Guevara is charged with one count of possession with intent to distribute more than one kilogram of a mixture and substance containing heroin. This matter is before the Court on Defendant's Motion to Suppress (Doc. 14) evidence seized in a vehicle stop and statements he later made while in custody.  The Court held a hearing on Defendant's motion, and granted supplemental briefing.  The motion is fully briefed, and the Court is now ready to rule, having reviewed the evidence and arguments adduced at the hearing. As explained more fully below, the Court grants the motion in part and denies the motion in part.[1]

### I.      Findings of Fact

Based on the evidence and testimony adduced at the hearing, the Court finds as follows by a preponderance of the evidence.  On June 26, 2019, Deputies Finley and Jimerson conducted a traffic stop of a 2008 Ford Fusion on I-70, eastbound, within Logan County, Kansas.  Tomas Cabrera-Lopez was the driver; Defendant was the sole passenger. Road and weather conditions

---

[1] This matter was reassigned to the undersigned after the evidentiary hearing.  Doc. 22.  The parties have consented to have the Court decide the motion upon review of the existing record without further hearing.  Doc. 28.

were favorable.  There was no rain or obstructions, the road was straight and the terrain mostly

smooth, the skies were overcast, and there was intermittent wind typical of the Kansas plains.

While facing eastbound, the officers had observed the vehicle's right tires drift

approximately half a tire length onto the right edge or fog line for three to four seconds.  The

vehicle then immediately drifted back toward the center line, touching the center line by

approximately half a tire length for three to four seconds. As the vehicle passed the officers, they

saw the silhouette of the driver with his head leaning back on the headrest.  Believing that the

contact with the lane edge lines violated K.S.A. § 8-1522(a), they began following the vehicle.

Over the course of the next one and a half to two miles, the vehicle passed onto the right edge or

fog line or again, and the officers initiated the traffic stop.

Deputy Jimerson remained in the patrol vehicle while Deputy Finley walked to the

vehicle and interacted with the occupants.  Cabrera-Lopez and Defendant spoke little English, so

communication was difficult.  They communicated with Finley in a combination of "broken

English and broken Spanish," and indicated that they were tired and traveling to Kansas City for

a few days.[2]  When asked for their information and the vehicle's registration, Cabrera-Lopez

provided a California registration in his sister's name but did not provide a driver's license.

Based on the documents they provided, Finley determined that Defendant and Cabrera-Lopez

were from Sinaloa, Mexico.

During this initial interaction, Finley smelled the odor of air freshener and old fast food.

Finley spotted several air fresheners hanging from the rearview mirror, fast food wrappers and

clothing in the back seat, and noted that the vehicle had a lived-in appearance.[3]  Finley also

---

[2] Hearing Tr. at 14.

[3] *Id.* at 17.

spotted a photo of Jesus Malverde, the claimed patron saint of drug traffickers, next to the speedometer.  When Finley communicated with the two men he observed that they both exhibited excessive exhaustion and nervousness; and they both began eating what appeared to be hours-old fast food in the middle of questioning.  Finley briefly took their documents back to the patrol vehicle for review, informed Deputy Jimerson that he suspected criminal activity based on the circumstances and returned to the car with a handwritten card of phonetic Spanish phrases useful in traffic stops.  Finley returned their documents to them, and with the aid of the card, asked them where they were coming from and where they were going; whether there were any drugs, weapons, or large amounts of the cash in the vehicle; and for permission to search the vehicle.  Defendant and Cabrera-Lopez consented, in Spanish, to a search of the vehicle.  The officers searched the trunk and found several bundles of heroin behind a rear quarter panel, partially concealed by the upholstery.  Defendant and Cabrera-Lopez were placed under arrest, on suspicion of drug trafficking, and taken to the Logan County Sheriff's Office.

At the Sheriff's Office, Task Force Officer Richards interviewed Defendant with the assistance of a Spanish phone-interpreter, recording the questioning with a separate device. Technical difficulties with the phone almost immediately ensued. The first interpreter was unable to hear Richards and Defendant.  Richards had to disconnect and reconnect multiple times before establishing a satisfactory connection with another Spanish phone-interpreter.

Through this interpreter, Richards advised Defendant of his *Miranda* rights and asked Defendant if he understood his rights.  Defendant responded affirmatively.  The following exchange then occurred:[4]

> Richards:  Are you willing to answer some questions?
> Interpreter (in Spanish): Do you have the willingness to respond some questions?

---

[4] The transcript of this call is in English, with the Spanish portion of it translated into English.

Defendant (in Spanish): MMM—No, because—I want to advise—I want to be advised—
Richards: Can you speak up a little—
Defendant (in Spanish): An Attorney?
Richards: Can you translate that please?
Defendant: [Unintelligible]
Interpreter: This is the interpreter speaking.  One moment please uh—Officer, I—I wasn't able to catch uh, what he said because he's very far away from the device.
Richards:  Okay.
Interpreter: Would it be possible to put it closer to him?
Richards: Yeah.
Interpreter: And then have him repeat [unintelligible]
Defendant: Okay
Richards: Could you ask him to speak up a little bit too?
Defendant: Yeah.
Interpreter: Sure
Richards: Cause he's right –he's right here with me so—
Interpreter (in Spanish): Sir, could you speak a little louder please?
Defendant (in Spanish): Yes, uh [unintelligible]—you asked me if I was willing to answer any questions right?
Unknown Male: This is shit—
Unknown Male: Who's ID—
Interpreter: Did you ask me if I wanted to ask uh—answer any questions?
Richards: Yes, so that's are you willing to answer some questions?
Interpreter (in Spanish): Are you willing to answer some questions?
Defendant (in Spanish)t: Eh—yes, yes.[5]

Richards proceeded with questioning Defendant, who stated that he and Cabrera-Lopez had been traveling to an unknown location in or around Kansas City.  Defendant stated that an unknown individual in California gave them instructions and later a second unknown individual communicated with them by phone and provided further instructions as they neared the city. Defendant claimed he could not provide the name of the first individual nor could he describe the second individual.  Richards asked Defendant to identify the second individual's contact information on his phone; and Richards further attempted to confirm the first individual's

---

[5] Ex. 408, at 3-4.

ethnicity or other information.  After stating that he did not know the first individual, Defendant

asked if he could request an attorney, and further stated "I would like you to wait for my

lawyer."[6]

After this request for counsel, officers attempted to enlist Defendant's assistance in a

controlled delivery.  Cabrera-Lopez asked officers about the possibility of cooperating with law

enforcement, indicating that he and Defendant could provide information.[7]  Cabrera-Lopez

explained that Defendant's phone would ring in two hours, and if Defendant did not pick up, the

caller would know that something had gone wrong.  When officers advised Cabrera-Lopez that

Defendant had indicated that he was not willing to assist, Cabrera-Lopez offered to convince

Defendant to change his mind.[8]  Officers then brought Defendant to Cabrera-Lopez so the two

could speak.  The pair's conversation continued to be recorded, and multiple officers remained in

the room.

Cabrera-Lopez and Defendant discussed the possibility of cooperation, Defendant's fear

that cooperation could put his life at risk, that the government would protect them, and how the

they were originally to be contacted and paid.[9]  After this discussion, officers remarked, "let's

get back to [Defendant]—let's be sure that he does not want a lawyer," asking the interpreter to

> make sure that [Defendant] is okay with talking to us because he already had said
> that he wanted a lawyer and I'm just making sure that this is under his free will and
> that he's wanting to talk to us and help us out.[10]

---

[6] *Id.* at 8.

[7] Ex. 406, at 1–3.

[8] *Id.* at 4.

[9] *Id.* at 5.  Cabrera-Lopez further expressed fear that he would be in danger if he were jailed.  *See id.* at 19.

[10] *Id.* at 11.

Defendant explained that he was now willing to talk so that he would not be sent to prison.  He revealed that a school acquaintance had originally contacted him to arrange the delivery and further admitted to picking up the drugs and placing them in the car with Cabrera-Lopez.[11]  He denied knowing what kind of drugs the packages contained.

Ultimately, Defendant and Cabrera-Lopez agreed to participate in a controlled delivery.  To effect the delivery, officers drove the pair to Topeka, where they spent the night before proceeding on to Kansas City.  Defendant was not brought before a magistrate judge, but was instead provided a waiver of prompt presentment, which he signed on June 27, 2019, at 8:46, approximately 22 hours after his arrest.  The controlled delivery was set to occur the same morning.  The delivery failed, and Cabrera-Lopez escaped.

## II.     Discussion

Defendant moves to suppress evidence seized during the traffic stop and statements he made while in custody.  The Government argues that he lacks standing with respect to any evidence seized during the traffic stop, and that any statements were obtained after a valid waiver of his *Miranda* rights.

### A.     Standing

Under Fourth Amendment law, "a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.'"[12]  Such stops "necessarily curtail[] the travel a passenger has chosen just as much as [they] halt the driver," and a passenger's attempt to leave the scene "would be so obviously likely to prompt an

---

[11] *Id.* at 16–17.

[12] *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).

objection from the officer that no passenger would feel free to leave in the first place."[13]  As a result, passengers have Fourth Amendment standing to challenge the legality of a traffic stop, and thereby seek suppression of evidence seized or later derived from an unlawful detention.[14] Accordingly, the Court must determine the validity of the initial stop to decide whether Defendant has standing to suppress the evidence seized from the vehicle.

**B.      The Initial Stop**

**1.      Applicable Standard**

"A traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."[15]  On this issue, the Court's "sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction."[16] "While either probable cause or reasonable suspicion is sufficient to justify a traffic stop, only the lesser requirement of reasonable suspicion is necessary."[17]

Defendant unpersuasively argues that the Government must have probable cause to justify a vehicle stop, that neither the Tenth Circuit nor the Supreme Court expressly allows reasonable suspicion alone, and that both courts' references to reasonable suspicion are merely dicta.  But, for example, in *Botero-Ospina*, where an officer both "observed a violation of [Utah traffic laws]" and "was able to articulate specific facts which, in light of his training and

---

[13] *Id.* at 257.

[14] *See id.* at 259.

[15] *United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001) (citing *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995)).

[16] *Botero-Ospina*, 71 F.3d at 787 (quoting *Prouse*, 440 U.S. at 661).

[17] *Callarman*, 273 F.3d at 1287.

experience, gave rise to a reasonable suspicion that [the defendant] may have been driving under the influence," the Tenth Circuit explained that the officer was "fully warranted" in stopping the defendant "[f]or either or both of these reasons[.]"[18]  In *Callarman*, the Tenth Circuit addressed whether the Supreme Court's decision in *Whren v. United States*[19] overturned *Botero-Ospina*, ultimately concluding that it did not.[20]  Although Defendant argues that both *Botero-Ospina* and *Callarman* were alternately grounded in probable cause and their statements about reasonable suspicion were merely dicta, the Tenth Circuit does not treat the standard as such.  In an unpublished case, the Tenth Circuit has squarely held that an officer's reasonable suspicion is sufficient justification for a traffic stop.[21]

### 2.   Validity

The Government offers three potential bases for reasonable suspicion justifying the stop: (1) violation of state traffic regulations; (2) intoxication; and (3) driver exhaustion.

First, the officers had reasonable suspicion of a violation of K.S.A. § 8-1522(a) (the "single-lane statute") which provides, in relevant part:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules in addition to all others consistent herewith shall apply.
>
> (a) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.[22]

---

[18] *Botero-Ospina*, 71 F.3d at 788.

[19] 517 U.S. 806 (1996).

[20] *Callarman*, 273 F.3d at 1287.

[21] *See United States v. Flores-Olmos*, 438 F. App'x 713, 715 (10th Cir. 2011).

[22] K.S.A. § 8-1522.

The Kansas Supreme Court has interpreted § 8-1522(a),[23] and that interpretation is binding on this Court.[24]  As interpreted, the provision establishes two rules:

> The first requires a driver to keep entirely within a single lane while traveling on a roadway with two or more clearly marked lanes.  That rule is temporarily suspended when it becomes impracticable to stay within the lane markers and when the driver is properly effecting a lane change.  Proof that driving outside the lane markers created no safety hazard is not a defense to the single lane rule.  The second rule provides that before a driver may change lanes or move from the current lane of travel to another location, he or she must ascertain that the movement can be made with safety.[25]

Defendant argues that § 8-1522(a) applies only when the vehicle fully crosses a lane boundary line, rather than just touching the lane line, and that the Government lacks both reasonable suspicion and probable cause for a traffic stop if the vehicle does not fully cross a lane line.  The Government responds that *Marx* does not clearly require Defendant's reading of the statute, and that in any event, officers also had reasonable suspicion to stop the vehicle for impairment or exhaustion.

To be sure, the *Marx* court held that that § 8-1522(a) requires that the driver keep entirely within a single lane, which suggests that the statute can be violated if any part of the car is outside of the lane, which happens even if the car's tires are touching the lane line.  And, while the *Marx* court did reject the idea that a single "incidental and minimal" crossing of a lane boundary line would violate the statute, the court emphasized that its conclusions were based on the absence of evidence in the record that could have dispelled the defendant's potential justifications for failing to maintain a single lane.[26]  Unlike the paucity of evidence in *Marx*, here there was sufficient evidence negating potential justification for failing to maintain a single lane.

---

[23] *State v. Marx*, 215 P.3d 601, 612 (Kan. 2009)

[24] *See e.g.*, *Chavez v. Baker*, 399 F.2d 943–44 (10th Cir. 1968).

[25] *Marx*, 215 P.3d at 612.

[26] *Marx*, 215 P.3d at 612–13.

Here, officers observed the vehicle cross onto a lane boundary three times over a relatively brief time and distance, and there were no mitigating circumstances such as poor weather, winding and mountainous terrain, traffic conditions, or obstacles in the roadway.[27]  While there was intermittent wind, Deputy Finley testified that he observed that other vehicles of similar size were not having difficulty maintaining a single lane.[28]

Moreover, after observing the vehicle crossing the lane lines, officers observed the driver's head leaned back on the headrest.  This supplied further reasonable articulable suspicion that the driver was impaired or exhausted.

### C.    Extension of Stop and Search of the Vehicle

Defendant next argues that the evidence seized during the search of the vehicle must be suppressed because the search was the product of an unlawfully prolonged detention after the initial stop.  The Government responds that Defendant lacks standing both because the stop became a consensual encounter and because the officers gained reasonable suspicion of illegal activity sufficient to prolong the detention.

Once the initial purpose of a traffic stop has concluded, further detention is permissible if "(1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or (2) the initial detention has become a consensual encounter."[29]  "A detention for a traffic citation can turn into a consensual encounter after the trooper has returned the driver his documentation so long as a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information."[30]  For there are

---

[27] *See* Tr. at 11.

[28] *Id.*

[29] *United States v. Bradford*, 423 F.3d 1149, 1157 (10th Cir. 2005).

[30] *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1308 (10th Cir. 2006).

circumstances under which a reasonable person would not feel free to leave, including but not limited to the presence of multiple officers, physical contact with the suspect, the officer's tone of voice, and intimidating body language.[31]

Here, the stop did not become a consensual encounter.  Although Finley returned their documents, as *Guerrero-Espinoza* explains, this alone does not necessarily transform a traffic stop into a consensual encounter.[32]  As the dash cam footage shows, after returning their documents, Finley remained next to the vehicle, touching the vehicle with his forearm and appearing to lean partway into the vehicle.  In order to leave, Cabrera-Lopez would have had to either strike Finley with the vehicle or risk doing so.  Based on Finley's body language and continued contact with the vehicle, the Court finds that a reasonable person would not have felt free to leave or disregard further questioning. Thus, the encounter did not become consensual.

Lacking consent, the officers needed reasonable suspicion of criminal activity in order to prolong the stop.  To extend the stop based on reasonable suspicion, the Court looks to the totality of the circumstances to see whether "[an objectively reasonable] officer had a 'particularized and objective basis for suspecting legal wrongdoing.'"[33]  The standard "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"[34]  Although the standard requires more than a mere hunch, "the likelihood of

---

[31] *See United States v. Chavira*, 467 F.3d 1286, 1291 (10th Cir. 2006).

[32] *Guerrero-Espinoza*, 462 F.3d at 1308.

[33] *Bradford*, 423 F.3d at 1157 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

[34] *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

criminal activity need not rise to the level of probable cause [or] a preponderance of the evidence standard."[35]

The Government emphasizes six facts in support of reasonable suspicion:

[1] [Cabrera-Lopez and Defendant's] nervousness, which exceeded the level of nervousness common to members of the innocent motoring public;
[2] the vehicle was owned by a non-present third party . . .
[3] they were coming from Culiacan, Sinaloa, Mexico, to Kansas City, [each] known distribution points for drugs;
[4] the overwhelming odor of air freshener in the vehicle;
[5] the vehicle had a lived in appearance, giving the impression they were traveling great distances over the road and obtaining fast food instead of stopping and eating for breaks; [and]
[6] on the dash of the vehicle, Finley observed a photo of "Jesus Malverde" . . . a "narco saint" and folklore hero in the Mexican state of Sinaloa, for drug traffickers.[36]

At the hearing, Finley testified to these observations, his training and experience in other drug cases, and why these factors in totality made him suspicious of drug trafficking.  Defendant challenges each observation in turn, arguing that all or most of the above facts are entitled to little or no weight, or are insufficient as a matter of law.[37]  Indeed, Defendant posits innocent explanations for many of Finley's observations.

But the Court must evaluate the circumstances together, not in isolation, and "even if each factor confronting [the officers] may have had an innocent explanation when standing alone, the totality of the circumstances compels the conclusion that [the officers] had a particularized and objective basis for suspecting legal wrongdoing."[38]  Finley observed that Cabrera-Lopez and Defendant exhibited excessive exhaustion and nervousness; their eyes were

---

[35] *Id.* at 274 (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

[36] Doc. 15, at 20.

[37] *See State v. White*, 584 F.3d 935, 951 (10th Cir. 2009) (travel to or from so-called "drug source cities" or "distribution cities" is of "minimal" probative value); *United States v. Santos*, 403 F.3d 1120, 1127 (10th Cir. 2005) (nervousness alone is "of limited significance"); *United States v. Olivares-Campos*, 276 F. App'x 816, 821 (10th Cir. 2008) (third-party vehicle ownership less suspicious when driver can provide details about owner).

[38] *Bradford*, 423 F.3d at 1157.

bloodshot, they were leaning back in their seats and they started eating hours-old fast food when

he approached the vehicle.[39]  Moreover, the vehicle not only appeared to be lived-in, it smelled

lived-in too, with the odor of old fast food not masked by the multiple air fresheners in the

vehicle.[40]  And, multiple air fresheners may indicate an attempt to mask the odor of drugs.

Further, Cabrera-Lopez and Defendant were from Sinaloa, Mexico and were traveling cross-

country to Kansas City in a third party's vehicle, without a valid driver's license, and with a

photo of Jesus Malverde, the saint of narco-traffickers, placed near the speedometer.[41]  Under the

totality of the circumstances and in light of the officers' training and experience, these facts were

sufficient that a reasonable officer under the circumstances would have reasonable suspicion that

the vehicle's occupants were engaged in drug trafficking.  Accordingly, the officers reasonably

prolonged the encounter and Defendant was not unlawfully detained when Finley questioned the

men about their travels, the contents of their vehicle and gained their consent to search.[42]

Because Defendant was never unlawfully seized, he lacks standing to contest the

evidence seized in the search.  The Court turns to the remaining issues concerning Defendant's

statements to law enforcement.

### D.    Interrogation and *Miranda*

Under *Miranda v. Arizona*[43] and its progeny, a person subject to custodial interrogation

must be warned that he has a right to an attorney, regardless of his ability to pay.  "[O]nly by

---

[39] TR at 18–19.

[40] TR at 17.  *See United States v. Salzano*, 158 F.3d 1107, 1114 (10th Cir. 1998) ("a strong odor may give rise to reasonable suspicion . . . that the odor is being used to mask the smell of drugs").

[41] TR at 16–17.  *See United States v. Lopez-Gutierrez*, 334 F. Appx 880, 883 (10th Cir. 2009) (noting multiple images of Jesus Malverde among factors supporting reasonable suspicion).

[42] Ex. 3; Tr. at 23–24.

[43] 384 U.S. 436 (1966).

effective and express explanation . . . of this right can there be assurance that [a defendant] was truly in a position to exercise it."[44]  Once *Miranda* warnings are given, "[i]f the individual indicates in any manner, at any time to or during questioning, that he wishes to remain silent, the interrogation must cease."[45]

Invoking *Miranda* rights "requires, at minimum, some statement that can reasonably be construed to be an expression of desire for the assistance of an attorney."[46]  "Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer under the circumstances would have understood the statement to be a request for an attorney."[47]  The Supreme Court has recognized that this requirement may sometimes lead to difficult results, as

> requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate the right to counsel although they actually want to have a lawyer present.  But the primary protection afforded to suspects subject to custodial interrogation is the *Miranda* warnings themselves.[48]

"An accused in custody, 'having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him,' unless he validly waives his earlier request for the assistance of counsel."[49]  This analysis has two components: first, the court must determine whether an accused actually invoked his right to counsel; second, if the right was invoked, "courts may admit his responses to further questioning only on finding that

---

[44] *Id.* at 473.

[45] *Id.* at 473–74.

[46] *United States v. Davis*, 512 U.S. 452, 459 (1994) (citing *McNeil v. Wilson*, 501 U.S. 171, 178 (1991)).

[47] *Id.* at 459 (quotation marks omitted).

[48] *Id.* at 460.

[49] *Smith v. Illinois*, 469 U.S. 91, 94–95 (1984) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981))

he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked."[50]  The second prong of the waiver inquiry remains regardless of whether a defendant actually invokes his *Miranda* rights, and looks to the preponderance of the evidence to determine whether a defendant's waiver was free and voluntary.[51]  When analyzing the clarity of a defendant's request for counsel, "[the] accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself."[52]

Here, Defendant argues he unambiguously invoked his *Miranda* rights—and did not validly waive them—twice: first, immediately after the warnings were given; and second, after answering questions about his origin, destination, and contacts during interrogation.[53]  The Government responds that Defendant's first attempt to invoke his rights was ineffective because it could not be perceived by a reasonable officer under the circumstances and that, in any event, he knowingly and voluntarily waived his rights on both occasions prior to questioning.

### 3.    The First Attempt

Defendant's first attempt to invoke his rights occurred immediately after being given *Miranda* warnings.  Through the interpreter, Task Force Officer Richards read the warnings to Defendant, and Defendant confirmed that he understood his rights.[54]  When asked if he was willing to answer questions, Defendant responded (in Spanish) "no," and

---

[50] *Id.* at 95; *see United States v. Hawthorne*, 316 F.3d 1140, 1143 (10th Cir. 2003).

[51] *See Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010).

[52] *Smith*, 469 U.S. at 100.

[53] *See* Ex. 408, at 3–4, 8.

[54] *Id.* at 3.

stated that he wanted to be advised by an attorney.[55]  But the interpreter did not hear

Defendant say that he wanted to be advised by an attorney; so the interpreter did not

convey this statement to Richards.  This statement only came to light later, when officers

reviewed the recordings from a different device in the interview room.   At the time,

various technical difficulties prevented the interpreter from hearing Defendant say this,

and so his statement invoking his *Miranda* rights was never conveyed to law

enforcement.  At the suppression hearing, Richards testified that although he heard

Defendant say the word "No," Richards could not ascertain whether Defendant was

responding "no" to answering questions, or whether the word "no" was part of some

other phrase articulated by Defendant in Spanish.  Further, Richards testified that he did

not understand Defendant's reference to an "abogado" as a request for a lawyer.[56]

   The Court is persuaded that Defendant's first statement—now ascertainable

through the benefits of independent recording and translation—evidences that Defendant

invoked his rights.  A reasonable police officer under the circumstances would not have

understood his statement to be a request for counsel, given the language barrier and the

interpreter's inability to hear the statement.  Yet Defendant definitely invoked his rights.

Accordingly, the Court turns to whether the Government has met its burden of showing

that Defendant knowingly and intelligently waived his rights.[57]

---

[55] *Id.*

[56] *See* Tr. at 116 ("I heard no, and then he kept going on, so, I didn't know if that was all one word in the clip.  At the time, I didn't—I didn't catch that at all.").  Although TFO Richards recalled asking Defendant to repeat himself and to speak up, the request for repetition appears to have come from the interpreter, who asked Richards to have Defendant repeat the inaudible attempt to invoke his rights.  *See id.*; Ex. 408, at 4.

[57] *See Hawthorne*, 316 F.3d at 1143.

On waiver, the Court notes that Defendant's circumstances are rare.  Few are the cases where a defendant relies on a recorded interview to argue that they invoked their rights through an interpreter, fewer still are those where the defendant's statement is fully audible on the unenhanced recording.[58]  However, waiver law is sufficiently clear on this point: "[i]f the [Government] establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone is sufficient to demonstrate 'a valid waiver' of *Miranda* rights," and the Government need only "make the additional showing that the accused understood these rights."[59]  Whether a suspect understood his *Miranda* warnings is a question of fact, dependent upon factors including "whether the suspect acknowledged he understood his rights, whether he expressed an inability to understand the discussion, and whether he answered in a manner that was appropriate and responsive."[60]

Here, Defendant had already responded that he understood his rights.  Then he stated that he wanted the advice of counsel, a statement not heard by the interpreter, nor conveyed to the officers.  Defendant next asked if officers had asked if he was "willing" to answer some questions.  When Richards confirmed that he was asking if Defendant was willing to answer questions, Defendant unequivocally responded yes.  Thus,

---

[58] *See Dewey v. Neven*, No. 3:13-cv-00317-LRH-WGC, 2019 WL 7283125, at *7–*8 (D. Nev. Dec. 27, 2019) (rejecting collateral attack under *Strickland*, noting "[t]he invocation is, without the aid of enhancements, unintelligible"); *Woodward v. Sec'y, Fla. Dep't of Corr.*, No. 3:13-cv-155-J-34JRK, 2016 WL 1182818, at *11 (M.D. Fla. Mar. 28, 2016) (rejecting argument that the court presume "that [the defendant] invoked his right to counsel or his right to remain silent" during inaudible portions of a recording); *Golson v. Allison*, No. CV 11-9401-PA (JPR), 2014 WL 2452872, at *14 (C.D. Cal. Mar. 6, 2014) ("Although the recording was apparently 'inaudible' . . . Petitioner has never presented any evidence that he answered 'no' or anything similar"), *report and recommendation adopted*, No. CV 11-9401-PA (JPR), 2014 WL 2465143 (C.D. Cal. May 31, 2014).

[59] *Thompkins*, 560 U.S. at 384; *see also United States v. Ortega*, No. 15-10130-03-EFM, 2016 WL 4702421, at *5 (D. Kan. Sept. 8, 2016).

[60] *Ortega*, 2016 WL 4702421, at *5; *see Matthews v. Bonner*, 605 F. App'x 741, 741-42 (10th Cir. 2015).

although Defendant did not repeat his earlier negative answer to the same question, he asked Richards for confirmation that Richards was asking whether Defendant was "willing" to answer questions.  This was initiated by Defendant.  And, Defendant's use of the word "willing" evidences that he understood that he did not have to answer questions. Defendant then gave answers that were appropriate and responsive to questions. There is no evidence that he was unable to understand his rights, that he lacked knowledge of his rights or that his answers were coerced.  Accordingly, under extant law, Defendant's statements made after the first invocation of rights are not subject to suppression, because Defendant immediately thereafter knowingly and intelligently waived his rights.

### 4.      The Second Attempt

Defendant's second attempt to invoke his *Miranda* rights was both far clearer to the officers and actually translated at the time.  After a series of questions, Defendant asked, "Can I ask for a lawyer 'cause I don't know anything?"[61]  When officers asked if they could continue looking through his phone, he reiterated, "I would like you to wait for my lawyer."[62]  The Court finds that Defendant unambiguously invoked his right to counsel.  A reasonable officer under the circumstances would have understood his statements as invoking his *Miranda* rights.  Although questioning ceased this time, the cessation was temporary.[63]  Officers re-engaged Defendant through Cabrera-Lopez, for the purpose of obtaining cooperation.[64]

Under the *Edwards* rule, Defendant, "having expressed his desire to deal with the police only through counsel, [was] not [to be] subject[ed] to further interrogation by the authorities until

---

[61] Ex. 408, at 8.

[62] *Id.*

[63] *See id.* at 8–9.

[64] *See* Ex. 406, at 4–5.

counsel ha[d] been been made available to him, unless [he] himself initiate[d] further communication."[65]  This safeguard protects against both "express questioning" and its "functional equivalent".[66]  A "functional equivalent" includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."[67]  Here, the Court concludes that the use of Cabrera-Lopez, in the presence of multiple law enforcement officers and for the purpose of convincing Defendant to assist in a controlled delivery, was a "functional equivalent" to custodial interrogation.

The Government argues that the use of Cabrera-Lopez was not sufficiently coercive to trigger the *Edwards* rule under *Arizona v. Mauro*[68] and *United States v. Cook*,[69] which both explain that the Government does not violate *Edwards* in the absence of particular coercive concerns.  In *Mauro*, the Supreme Court found no *Edwards* violation when a man's wife spoke to him after police questioning, leading him to make incriminating statements in the presence of an officer and a recording device.  The Supreme Court based its conclusion on the fact that "the purpose behind . . . *Miranda* and *Edwards*" is to "prevent[] government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment."[70]  The Tenth Circuit reached the same conclusion in *Cook*, relying on the Supreme Court's analysis in *Illinois v. Perkins*[71] to explain that "when the suspect does not know he is conversing with a government agent, [coercive] pressures do not exist," further explaining

---

[65] *Edwards*, 451 U.S. at 484.

[66] *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).

[67] *Id.* at 301 (footnote omitted).

[68] 481 U.S. 520 (1987).

[69] 599 F.3d 1208 (10th Cir. 2010).

[70] *Mauro*, 481 U.S. at 529–30.

[71] 496 U.S. 292 (1990).

that the defendant, under the circumstances "was completely unaware that he was in the presence of a government agent."[72]  The reasoning of *Perkins* is instructive here, as it recognizes "*Miranda*'s premise that the danger of coercion results from the interaction of custody and official interrogation, whereby the suspect may feel compelled to speak . . . in the hope of more lenient treatment should he confess."[73]

This coercive influence is readily apparent here.  Defendant's self-incriminating conversation with Cabrera-Lopez was initiated by law enforcement rather than on his own initiative, and his subsequent agreement to cooperate shows that he did so precisely in hope of more lenient treatment, fearing for his life if that leniency were not ultimately provided.[74]  Accordingly, the Court grants suppression of the statements made after Defendant's second invocation of rights.

### E.      Presentment

Defendant further asks the Court to suppress all statements made outside the six-hour safe harbor period of 18 U.S.C. § 3501(c), arguing that his English-language waiver of prompt presentment is invalid for (1) unreasonable delay; (2) insufficiently-supported translation to Spanish; and (3) omission of Rule 5's consular notification provision.  The Government argues that it has met its burden to show a waiver of Defendant's rights, but that in any event it does not intend to introduce any statements made outside of the safe harbor period.  Given the Government's acknowledgement that it will not use any statements made outside of the safe

---

[72] *Cook*, 599 F.3d at 1214.

[73] 496 U.S. at 292.

[74] *See* Ex. 406, at 6.  Mr. Cabrera-Lopez further suggested that the lives of their families could also be at risk.  *See id.* at 18.

harbor period, the Court grants this motion.  The Government is thus precluded from using any statements made by Defendant outside of the six-hour safe harbor period.

III.     **Conclusion**

The Court denies Defendant's motion to suppress evidence seized in the search because there was reasonable suspicion justifying the stop and justifying the period of detention before Cabrera-Lopez and Defendant consented to a search of the vehicle.

The Court denies Defendant's motion to suppress statements he made after his first invocation of rights because he immediately, knowingly, intelligently and unequivocally waived his rights without any coercion.

The Court grants Defendant's motion to suppress statements after his second invocation of rights.

The Court further grants Defendant's motion to suppress all statements he made outside of the six-hour safe harbor period.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Suppress (Doc. 14) is **granted in part and denied in part**.

**IT IS SO ORDERED.**

Dated: July 22, 2020

_____ s/ Julie A. Robinson_____
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE